21-2764, Pfizer v. United States Department of Health. Thank you. All right. Counsel for appellant Pfizer may take the podium. Masks are optional. You have reserved three minutes of your time, and you may proceed when you're ready. Thank you, Your Honor, and may it please the court. The administrative decision in this case is a criminal standard that is contrary to the statutory text and to both this court's precedent and the government's own prior decisions. As this court has held, the AKS only reaches remuneration offered as a quid pro quo in return for and in an attempt to obtain influence over the reason or judgment of the recipient. Wouldn't paying the people who take this drug make it more attractive for them to take it? Your Honor, all that Pfizer's program does is remove a financial obstacle to the patient filling a prescription that the doctor has already made. Counsel, if you're so interested in removing that financial, why don't you just reduce the price of this drug? Your Honor, the price argument the government makes is a red herring for several reasons. First, the AKS is not a price control statute, but more importantly— As you seem to be, that's the motivation. Why don't you just reduce the price of the drug? Your Honor, the price of the drug is driven in large part by the very small number of patients who would be eligible for it, and Congress has recognized that. I understand that, but didn't you get some money because it was an orphan drug from the government? No, you don't get money for that. What you get is exclusivity, which allows you to charge a higher price because you have a longer monopoly period in order to recoup it. Congress has of exclusivity, opportunity to charge a higher price in order to recoup the investment over a smaller number of patients. But the price argument is a red herring for the additional argument that even if Pfizer cut the price by half, it would still be $8,000 a year. What if they cut it by half again? By half again, it would still be about a $5,000. But $5,000, you're in the realm where people can afford it. Middle-income people would be able to afford it, as opposed to $30,000. Many thousands would not, Your Honor. The research shows that patients... Why wouldn't the charity program or some other structure take care of it? Well, Your Honor, that's the problem with the government's argument. The government said, and this is footnote 36A222, that addressing a beneficiary's inability to pay would without question influence the patient's decision to fill a prescription. In other words, even a charity, even charity by a family member, because it addresses the patient's inability to pay, satisfies the statutory requirements according to the government. That would criminalize any family member's generosity. Anyone in this courtroom would want to provide a family member the necessary funds to fill a prescription that their doctor has given them. Why is it, I'm sure it's a terrible oversimplification, but explain to me why, that what Pfizer is ultimately, what it's really doing is paying some money to the patients, and eventually it gets back a great deal more money from the government for the payment of the drug. Your Honor, that view of remuneration would actually criminalize just the sale of the drug. Buying a drug that could save a patient's life for what would only cost the patient $13,000 at most, because the government's going to pick up the other $210,000, induces the patient to buy the drug and cost the government money. But that's not a crime. It's the same argument if you double the price, as long as you cover the copay directly. Your Honor, there are many circumstances where paying the copay would violate the AKS, and we admit that. This is not, we're not arguing for a significant change in the law. We're arguing for the court to hold the government to the same standard this court announced in Crichelli. It's a standard the Secretary herself announced in the Hanlester case, which they cite. So why don't we just negotiate with the government for your reimbursement rate and give the drug free to the people who need it? Your Honor, the Congress has prohibited the government from negotiating prices with companies. It has prohibited that. And we have here a product that addresses a deadly disease where the only alternative that patients are supposed to take, according to the OIG's decision, is a product that costs twice as much. The government will pay twice as much if the patient takes the product in the hospital, even though that product has not been approved safe and effective. But if that price comes down or if a new drug comes along, you're not going to pay the cost shared to the patient for the purchase of that treatment, right? Your Honor, I candidly admit that if the circumstances change because there is another product that is equally effective and costs the same or less, then there may be a different decision. But we have- But that's not the program that's been set up. And that's not what you asked OIG to evaluate. Can I just un-text? Your argument is the addition in the 78 Act of remuneration and including has no effect on the meaning. The statute would mean exactly the same thing if the word remuneration were gone and the word including were gone. No, Your Honor, because I think that there were situations, and in fact we cite in our statement by the chair of the House Ways and Means Committee, that the amended statute would, for example, reach paying for somebody to work in a physician's office, even though that would not be a classic kickback. But it would be a corrupt effort to induce the doctor to prescribe something that they would not otherwise have done. It's that skewing of the medical decision making that is essential. That's the corruption. In the Court's decision in Zacker, it held that corruption was essential to each of those three words. It was the 72 text and it was about bribery. Well, it was about bribery, kickback, and rebate. The Court said that its construction was based on the trilogy and reading the three of them together. And when Congress amended the statute, it didn't jettison those. It didn't just say remuneration to induce, although remuneration to induce itself connotes the idea of a quid pro quo in order to obtain influence over the judgment or reason of the recipient. That's what this Court held in Crichelli. But the inclusion of the words, the retention of the words kickback, bribe, or rebate shows that Congress meant that the statute would continue to focus on such corruption. That's the same mode of analysis that this Court implied in the Beretta case, where using the doctrine of justum generis, it said when the statute says a general word, there are applicable statutes, including, and then two examples, and the two examples each were statutes specifically addressing firearms, they said the general applicable statute must also have that common characteristic. And that's what we're arguing for here. But the Court doesn't need to go that far because, again, all the Court needs to do is apply the standard that the Court upheld in Crichelli. That standard, which is remuneration, is a quid pro quo, and to induce is an attempt to gain influence over the reason or judgment of the recipient. That's a- What is the notion of quid pro quo? Why does it matter? I mean, it's Latin and it sounds bad, but I mean, why does it matter? Your Honor, just this last week in the Cruz case, the Supreme Court referenced quid pro quo corruption. That notion of quid pro quo corruption- Corruption, I understand. I understand corruption, but I don't understand the fact that it's a quid pro quo when I- It's because it connotes, but again, I think to induce does the same work, that the decision is going to be something other than what it would be on its merits. And that's what's lacking here because on its merits, everybody would take this drug. It's the only drug that FDA has approved to treat a deadly disease. At this time, we are more than three years after the approval of this drug. Patients who were diagnosed about the same time this drug was approved may well have died because they have not had access to this life-saving treatment. And that's unnecessary because- But what is it? This treatment extends life or just makes it better the last couple of years? Both, Your Honor. It extends life and makes it better, and for that reason, offers hope that the patient will then benefit from a cure if that is later accomplished. But that hope is- Pfizer benefits by being paid a boatload of money by the government, right? Pfizer benefits from these patients exactly as Pfizer benefits from low-income patients or from wealthy patients. I understand that. It benefits if they use the drug, and they can only use the drug because Pfizer gives them the money to do it. But that's true. Yes, that's right, Your Honor. That is an entitlement under the Medicare statute that these middle-income beneficiaries have paid in their entire lives just as the wealthy people and just as the poor people. For poor people and for wealthy people, the government pays $210,000, and those people get their life-saving drug. But if you are middle class and cannot afford it and don't have the luck of having a wealthy family member who, according to the government, maybe they do the prohibited conduct, but maybe they're not a bad person. The government says they acknowledge that the statute as they read it is too broad. The district court recognized the same. So on appeal, they add a new element, first time on appeal, bad purpose. They don't define the bad purpose, but to the extent that they suggest that it is, as Hanlester held, specific intent to violate the statute or even knowledge of the statute, Congress overruled Hanlester on that point statutorily when it added subsection H to the statute in 2010. What that indicates is that willfully in this statute is, as in other statutes, reflective that this is a statute that prohibits malum in se, something that is wrong in and of itself. You would know that it's wrong just by doing it. You don't even need to know about the statute. And that's true on our construction. It's true on this court's construction in Cookelly. But it is not true on the government's construction applied in this case. We think that on the unique facts of this case, visor is entitled to judgment's favor. But you don't need to find that. All this court needs to find is that the government applied a standard that is contrary to what this court upheld in Cookelly. And that would be sufficient to require vacant agreement. Thank you, counsel. Thank you. We'll hear from Ms. Tinney. Can I, I'm sorry, Cookelly, I just, when I screw everything up and ask, Cookelly that you mentioned many times, that was a summary order, wasn't it? I mean, it's not- Yes, your honor. Yes, your honor. I just want to make sure, yeah. Thank you, I'm sorry. As I noted, the language that I was quoting was also in a published decision in Han Lester in the Ninth Circuit, which quotes actually a decision of the secretary from the DAD as the standard. Okay, I'm terribly sorry. Thank you. You may proceed. Good morning, and may it please the court. My name is Rebecca Tenio, and I represent the defendants in this case. Your honors, FISER is asking this court to insert words into the AKS to dramatically narrow the types of remuneration that may fall within the scope of the statute's prohibitions. FISER insists that the remuneration element of the statute itself must be corrupt, but that new requirement would contravene Congress's clear intent in expanding the statute to include any remuneration that is offered or And FISER's argument is not supported by the text of the statute, its structure, its history, canons of construction, or by comparison to any other statute. Beginning with remuneration, your honors, the phrase any remuneration in the amended AKS makes clear that the statute encompasses more than just what FISER is referring to, corrupt bribes or kickbacks or a certain subset of types of rebates that were referred to in the original form of the statute. So the amended statute clearly encompasses more than just payments made with corrupt intent. So when I pay my doctor for, because he doesn't take Medicare, when I pay my doctor, that's remuneration for him, even though it's not corrupt. Remuneration to him, even though it's not corrupt. I really apologize, Judge Sack. I actually am a little bit hard of hearing. It's actually me. No, no, no, it's my fault. We can argue about that later. But my question is that when I pay my doctor, that's, or for anybody, that's remuneration. That's giving somebody money to do something is remuneration. It's not anything, nothing necessarily corrupt in that, right? Is that what you're saying? Yes, your honor. Remuneration is defined not only in common dictionaries, but also in black's law dictionary. Remuneration is payment for a service, payment for a good, just remuneration. And it is true that is a broad phrase, but that is what Congress intended. And this court in Daliwal v. Salix in 2019, this court agreed that the language, any remuneration in the AKS means anything of value whatsoever. But it would only fall under the prohibitions of the AKS if at least one purpose is to induce purchases or referrals. So very broad doesn't necessarily mean ambiguous. We've got very broad language. But one of the arguments Pfizer makes is this leads to absurd results. So let's say you've got someone with this disease, they can't afford this. They hear that the district court here affirmed the decision. They understand what OIG has said. So a family member says, then I'll pay it. And Pfizer says, well, that's absurd, because under your definition, that would be criminal. Your Honor, that result would be extremely unlikely to occur for a couple of reasons. And that's because there are other limiting elements in the statute that do operate to limit the scope of the statute that would prevent such a prosecution from succeeding, so the intent to induce element is a second element here. And that's pretty specific. So the courts have held that the intent to induce someone to purchase a drug or to obtain a service, that means you have to be specifically designing your program or your scheme to induce a purchase of that particular drug. You can't just hope that someone will buy the drug or expect that you set up a program. And actually, Your Honor, when you asked about charities, there are cases that hold that, well, the OIG has said that bona fide independent charities, as Your Honor I think referred to, that are set up really independent pharmaceutical manufacturers, where the pharmaceutical manufacturer has no influence, that those would not have an intent to induce, like if a pharma company donated to such a charity, they would not be intending to induce purchases of their own drug. They would be donating to a bona fide independent charity. However, we see a lot of cases- You're assuming there's a broad charity that takes care of health generally and is not focused on this disease. Well, it could be a single disease state. It could be, but with the cases that we see that fall afoul of- Under these facts, if it was just this disease, how could it not have exactly the same result of paying some money to a charity and then resulting in huge payments for the government? For example, if the charity said, well, we're not going to funnel all donations from Pfizer, for example, just to purchase Pfizer's drug. It could also be if a needy patient thinks, oh, well, I actually do want to try these other therapies that some doctors are prescribing. Or I want to take some therapies that treat my symptoms. Or if another drug comes along, another drug that perhaps is in phase three trials now, that might be priced differently than the charity says, well, we're going to use donations for that purpose, too. So it could be one disease state. Go ahead. And I think going back to kind of, I think, Your Honor's question, there are bona fide independent charitable ways that Pfizer could be using to help people. But in terms of the absurd result question, which I've gotten away from a little bit, you would have to show that the generous relative is actually intending to induce purchases of this particular drug. So say, oh, my cousin has this disease and I have this intent to induce my cousin to actually purchase Pfizer's drug. That would be required. And also, the government, if the government wanted to prosecute you, would have to then also show the scienter element, which is that you had a bad purpose. And that is, admittedly, a very fact-sensitive inquiry that happens in a lot of criminal cases. But the government would have to show that you were acting with a bad purpose in making this donation, knowing that you were running afoul of the law. So what does count as a bad purpose, and why is Pfizer's effort to subsidize the very high cost sharing amount a bad purpose? Well, we don't really know if it's a bad purpose, and the decision that's on appeal here, all that's on appeal here is OIG's determination, and it's in Pfizer opinion, that the remuneration, as structured as Pfizer certified, looks like it could be prohibited by the AKS. That opinion doesn't say so long as there's a bad purpose. The opinion says, if Pfizer implemented it with the bad intent to induce, which we've discussed, and then also, in any case, the government would also have to prove a third element, which was scienter, the bad purpose. And there could be different evidentiary bases, either to strengthen the element of bad purpose or to weaken it. So, for example, if the government took discovery and found that Pfizer had a very, very tiny profit margin, and it really was just trying to help people, that might hurt the government in trying to prove the third element, which was scienter. Or if the government found evidence that Pfizer- So bad purpose is, proof of bad purpose, according to you, is part of this, of the case before, they have to have a bad purpose. It's part of proving an actual violation of the AKS. Certainly for criminal liability, for example, your honor. It is not actually part of the case before the court. Go ahead, I'm sorry. No, no, I'm sorry, your honor. What's before the court is whether or not OIG acted contrary to the law, meaning contrary to the text of the AKS, in saying that Pfizer's program, as Pfizer described it to OIG, could generate prohibited remuneration. That's the first part of the statute. That's all OIG did. OIG expressly said, we are not saying that we know Pfizer is going to implement this with a bad intent. And OIG said nothing about scienter at all, and that's because OIG never does that. But if they're found guilty of violating the AKS statute, the penalties are very severe for a company like Pfizer being cut off Medicare, isn't that true, and Medicaid, right? So it's really very dangerous for them to proceed unless they had more of a basis to conclude that OIG would not find them guilty of this bad purpose. Well, I mean, Pfizer, certainly Pfizer is free to proceed with its program, and yes, OIG has alerted Pfizer that if Pfizer implements the program with the bad intent to induce. And then also, under the statute, if Pfizer implements the program with a bad scienter, then yes, Pfizer could be at risk, perhaps. Can they get in a, I'm sorry. So the history of the AKS statute was originally to prohibit doctors from taking benefits to prescribe certain drugs, isn't that true? I think the original AKS actually, I looked at both sides of the potential. It also, yeah, I think the original AKS was not necessarily as narrow as that. Right, so don't you think it's a perversion of what Congress intended, not to allow patients to get some subsidy of a drug that no one could afford? Your Honor, Congress has a number of purposes here, and OIG also recognizes the value of helping needy patients. But as we've discussed a little bit already, there are other ways that Pfizer could be doing this. It could be working through a bona fide independent charity. It could be adjusting the pricing structure of its drug, which we don't have any visibility into. And it's important to note, Your Honor, that another very important congressional purpose here, which Congress can protect and OIG can protect, is to deter fraud and abuse and to protect the Part D benefit structure. And to protect the, I think conceitedly, already stretched healthcare system. And so, in structuring the Part D benefit in this way, which is a legislative choice, and the district court acknowledged it's a legislative choice here, and perhaps the correct remedy here is a legislative one. Will there be people who won't be able to get this medication without Pfizer's offering to pay the cost sharing? I don't know that I have the basis in the record to answer that, Your Honor. That is possible, and it is, again, conceitedly a legislative choice. That patient cost sharing obligations are intended to exert downward pressure on price controls. This is the main price control in the Part D benefit. And again, the remedy here to fix that issue is legislative. And on price, you're saying, even though, as Pfizer contends, they could cut it in half and maybe half again, and we're still looking at thousands of dollars of cost sharing. That's consistent somehow with getting prices of drugs under control? Well, certainly, I mean, it would help. Pfizer keeps saying, well, if we cut it, if we cut it, if we cut it, some people would still not be able to afford it. That may be true, but more people certainly would be able to afford it, and the healthcare system wouldn't be hit with such a large bill. But on the other hand, it is undoubtedly true that if this court dramatically slashed the definition of any remuneration, as Pfizer is asking, that the floodgates would open for drug companies to just keep increasing the list prices of their medications. Because they know that the Part D benefit is going to cover the lion's share of the cost. Thank you. Thank you. You have three minutes on the floodgates. Thank you, Your Honor. If I could, I have three points that I want to make. First, the government focuses on remuneration and very little attention on to induce. The government wants to induce to mean influence. Influence is the word that the BIS statute, the civil statute says, not the criminal AKS. And the civil statute carves out recipients and says that that's okay. Because they're not doctors, they can't prescribe. Of course, of course. So the civil statute says to influence, and it excludes beneficiaries. The criminal statute, which does apply to beneficiaries, requires more. It requires to induce, which is that notion of an attempt to exert influence over the judgment or- Not directly from any dictionary definition of inducement. You do sort of a two step. Induce means to entice, entice means to exert influence. Well, it's because of the combination of remuneration to induce. Because the remuneration has to be the why. It's the remuneration that's being held out there as, do this to get the remuneration. Here, any patient would get the drug in order to survive. Not because they're going to get any money in their pocket. They're not enriched by this. So that's the first point that I want to make. And then when the government then is challenged that this is an extremely broad statutory construction. They said, well, it would be extremely unlikely to apply it to a family member. But extremely unlikely is not the standard. And they say independent charities is the solution. Pfizer asked for an advisory opinion about an independent charity program, and the government refused to give an advisory opinion. Well, they said they were already considering that. No, because they were already prosecuting an independent charity on similar facts. So the government has cut off- I thought it was an investigation. An investigation, an enforcement action. These cases very rarely go to actual trial because, as your Honor indicates, the cost is prohibitive. Companies can't afford to do so. They have to settle with the government. And they were taking enforcement action against an independent charities. Independent charities necessarily satisfy what the OIG said constitutes a crime, or the conduct here, because they pay remuneration, something of value, to overcome a patient's inability to pay. The OIG said at 223, that would plainly involve remuneration to induce the individual to purchase. Charities do the same. So charities are also subject to criminal prosecution unless they do everything exactly like OIG says. So OIG makes everybody a criminal unless they say, we give you the green light. That's not how criminal statutes work. So- Wait, who gives whom the green light? OIG, by carving out a specific safe harbor. And then they say, wait, you didn't do it every jot and tittle the way we said. The crime becomes the advisory guidance, not the statute. Finally, I want to point out that the government's construction renders the advisory opinion process that Congress created in order to ensure that the AKS did not over deter good relationships, makes it illusory. Because on the government's view, everything satisfies the prohibited conduct. Remuneration to induce, because that's just anything of value to influence. And so everything becomes the bad intent. And they will never opine about the bad intent in an advisory opinion. So everything always becomes, will they exercise enforcement discretion not to go after it? That's not how criminal laws work. The statute as created by Congress is narrower. It's what this court said in Quick Kelly. It's a quid pro quo in an effort to obtain influence over the decision or reason of the decision maker, to corrupt it, to skew it in some way. There's no skewing of decision making here. So when would your subsidy kick in, after the prescription is made? Yes, your honor. In fact, there's a letter, it's the April 8th letter to the government that I think lays out all the parameters of this. And it's, I'm looking at page A174, but included among those are that Pfizer would do nothing to advertise this. It would not talk to doctors about it, it would not put it on its website. Well, you can talk to doctors, we know that. That was the genesis of the AKS. So they would not advertise this in any way. So the patient has already been diagnosed with an objectively diagnosable deadly disease, has already been prescribed their medication, and then they come looking to fill it and they can't afford it. And they would learn that there is a program to help them cover their co-pay. So Pfizer's program is designed to come within precisely the same safeguards that Congress laid out in the civil statute for pharmacies who want to waive co-pays. And Congress said, that's not bad because you're not skewing the choice between providers if you've done all of those things. Here, first, there is no other provider, there is no other drug. The other thing that doctors might prescribe is off-label, unproven, unsafe, and cost twice as much. The patients here will already have been prescribed their medication, all Pfizer's doing- If there were other competing drugs, the question in my mind is, would Pfizer do what it's doing here, since maybe, God, they wouldn't get the benefit of it by getting the money from the- Your Honor, I think that this case is very exceptional. And it shows just how broad the government's reading is. We are not trying to overturn the history of this statute. We're trying- No, but the answer is, that's not the program you've set up. It's not the program- You haven't offered to pay cost sharing or treatment, regardless of who the manufacturer or provider. That's right. That might have been part of the independent charity program, but again, the government would not even consider an independent charity proposal from Pfizer. So we were left with offering to pay the co-pay for Pfizer's own drug, the only drug that FDA has approved for this deadly disease. If there were a, as there usually is, I would hope, if there were a competing drug by a different manufacturer, this case would not arise. This case would be entirely different. There would be totally different questions about whether, if that other drug was twice as expensive and its evidence had been less good, that- Competition would reduce the price of the drug, wouldn't it? You said that. And it might well reduce the price of the drug, but that would be after Pfizer's statutory period of exclusivity. So- How long is that period? I'm not even sure that it applies now, because we're already three years out, your honor. So, but what I'm saying is that when the government, which has been prohibited by Congress from trying to negotiate prices, instead tries to use a criminal statute in effect to negotiate prices, we've got a problem. And when everybody who's either rich enough or poor enough or has a wealthy relative gets the drug, gets the $200,000 entitlement that they have, that they've been paying in for their entire lives. But counsel, isn't Pfizer part of the pharmacy, the pharmacological group that lobbies Congress to prohibit this negotiation? Aren't you part of that group? You're- Big Pharma, as it's called, aren't you part of it? Your honor, there are many reasons. Yes, Pfizer is part of Pharma. But that is not a basis to read a criminal statute that was enacted 20 years before, 30 years before. But you brought that statute in place. You're like the criminal who says stop me before I kill again, and then you lobby to keep this statute in place. Your honor, nothing in the Medicare statute itself, there is no prohibition on someone helping a beneficiary to pay their copay. There's no requirement that the beneficiary pay the copay out of their own pocket. If Congress wanted to prohibit that, they could have done so very easily. They didn't. So the family member is not a criminal. The charity is not a criminal. And when Pfizer does the same thing, when there's no other drug, there's no possibility of skewing the decision making, Pfizer is not a criminal either. Thank you, counsel. Thank you, your honor. The case's decision is reserved. The matter is under-